**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOE FLORES, an individual; and CONNIE FLORES, an individual,<br><br>              Plaintiffs,<br><br>      v.<br><br>EMERICH & FIKE, a professional corporation, et al.<br><br>           Defendants. | 1:05-CV-0291 OWW DLB<br><br>ORDER RE PLAINTIFFS' MOTION FOR RECONSIDERATION (DOC. 110) AND DEFENDANTS' MOTION TO STRIKE AND TO DISMISS (DOC. 118). |

## I.  INTRODUCTION

This is the third case filed by Joe and Connie Flores ("Plaintiffs") concerning a series of packing and marketing agreements entered into between Plaintiffs and DDJ, Inc., DDJ LLC, and related entities and individuals.  DDJ, Inc., and DDJ LLC filed for Chapter 7 Bankruptcy Protection on January 3, 2005.  Shortly thereafter, on March 1, 2005, Plaintiffs filed the instant complaint (*Flores III*), naming as defendants a number of individuals involved with DDJ and affiliated corporate entities (the "DDJ Defendants").  The *Flores III* complaint also names as defendants the law firm of Emerich & Fike and several individual attorneys at that firm (collectively, the "Fike Defendants") who represent many of the DDJ Defendants.

The Fike Defendants recently moved to dismiss the federal claims against them for failure to state a claim and to strike all of the state law claims against them pursuant to the

**1**

1  California anti-SLAPP statute.  A memorandum decision dated

2  February 21, 2006 granted the Fike Defendants' motions in their

3  entirety.  (Doc. 108.)  Plaintiffs were expressly given leave to

4  amend their complaint only with respect to the second (malicious

5  prosecution) and eighth (federal civil RICO) causes of action.

6  (*Id.*)  On March 13, 2006, Plaintiffs filed a 143-page amended

7  complaint, re-alleging **all** of the original federal and state law

8  claims.  (Doc. 113.)[1]

9       Before the court for decision are two motions.  First,

10  Plaintiffs request reconsideration of one aspect of the February

11  21, 2006 memorandum decision -- the order striking the "malicious

12  use of process" claim.  Second, the Fike Defendants move again to

13  strike all of the state law claims re-alleged in the amended

14  complaint on the ground that it is improper to permit amendment

15  after claims have been stricken pursuant to the anti-SLAPP

16  statute.  At the same time, in an abundance of caution, the Fike

17  Defendants move again to dismiss the eighth cause of action (the

18  federal civil RICO claim), as it is not clear from the face of

19  the amended complaint whether Plaintiffs' have amended this cause

20  of action.  Plaintiffs, in their supplemental response, concede

21  that they did not amend the civil RICO claim as to the Fike

22  Defendants.  (Doc. 125.)

23

24                    II.   **PROCEDURAL HISTORY**

25

26       [1]   Although Plaintiffs are pro se, flagrant disregard of a
27  court's order and overburdening of judicial resources by
    unjustified prolixity and multiplication of the proceedings
28  requires an appropriate response.

**2**

1      Plaintiffs filed their initial complaint against DDJ, Inc.,

2   DDJ LLC, and others in 1999, asserting claims under the

3   Perishable Agricultural Commodities Act ("PACA"), along with

4   state law contract and tort claims.  *See Flores et al v. DDJ,*

5   *Inc., et al.*, 1:99-cv-5878 AWI DLB ("*Flores I*").  In 2003, a jury

6   found for the Flores' on all claims against DDJ Inc. and DDJ LLC

7   ("the Judgment Debtors").

8      On October 15, 2004, the Flores' filed a second lawsuit,

9   alleging that individual officers of the Judgment Debtors

10  fraudulently transferred assets from the Judgment Debtors into

11  their own names.  *See In Re Joe Flores, et al. v. Dennis*

12  *Hagobian*, et al., 1:04-cv-6405 OWW DLB ("*Flores II*").

13     On January 3, 2005, DDJ, Inc. and DDJ, LLC filed for Chapter

14  7 bankruptcy protection.  Further proceedings in *Flores I* were

15  stayed pursuant to the automatic stay provision of the Bankruptcy

16  Code.  *Flores I,* Doc. 408 at 2.  Similarly, *Flores II* has been

17  stayed pending notice of whether the bankruptcy trustees will

18  authorize the case to proceed and whether the stay should be

19  lifted for that case.  (*Flores II*, Doc. 19 at 3.)

20     Shortly after the bankruptcy filing, the Flores' filed the

21  141-page complaint in this case ("*Flores III*").  The third

22  amended complaint alleges various forms of alter ego liability,

23  fraudulent transfers, and the existence of a racketeering

24  enterprise.  (Doc. 1 ("Compl."), filed Mar. 1, 2005.)  *Flores III*

25  names as defendants many of the individual and corporate

26  defendants named in *Flores I* and *Flores II*, although the Judgment

27  Debtors (DDJ Inc. and DDJ LLC) are not named.  The new complaint

28  names as defendants:  Emerich & Fike, a law firm that represented

**3**

1  DDJ Inc. and DDJ LLC in *Flores I*, and a number of individual
2  lawyers who practice at Fike (the "Fike Defendants").  Plaintiffs
3  request damages, injunctive relief, and attorney's fees.

4  On May 10, 2005, counsel for DDJ Inc. and DDJ LLC filed a
5  "notice of filing bankruptcy" in this case, asserting that these
6  proceedings also are subject to the automatic stay because the
7  pending claims concern property belonging to the debtors' estate.
8  The district court determined that the automatic stay applied to
9  some of the defendants, but requested further briefing on the
10  applicability of the stay to the remaining defendants.  (Doc.
11  72.)

12  The Chapter 7 Bankruptcy Trustee then submitted a report
13  indicating that the Trustee does not intend to pursue any of the
14  claims against the Fike Defendants and consented to an order
15  vacating the stay.  The district court vacated the stay and set
16  the Fike Defendants' previously-filed motions to dismiss and to
17  strike for hearing.  The Fike Defendants' motions were granted
18  with leave to amend on February 21, 2006.  On March 10, 2006,
19  Plaintiffs filed a "motion to alter or amend" the February 21,
20  2006 order with respect to their "malicious use of process
21  claim."  The Fike Defendants opposed.  (Doc. 116.)  Plaintiffs
22  replied.  (Doc. 121.)

23  On March 13, 2006, Plaintiffs filed an amended complaint
24  re-alleging all of the state and federal law claims contained in
25  the original complaint.  On March 30, 2006, the Fike Defendants
26  moved again to strike all of the state law claims in this case
27  and to dismiss the federal RICO claim.  (Doc. 118.)  The hearing
28  on Defendants' motion to strike and Plaintiffs' motion to

**4**

1  amend/alter was initially set for May 15, 2006.  As of May 1,
2  2006, the day on which Plaintiffs' opposition to the renewed
3  motion to strike was initially due, Plaintiffs had filed no such
4  opposition.  During the scheduled May 15, 2006 hearing, oral
5  argument on both motions was continued to June 26, 2006.  On June
6  16, Plaintiffs filed a supplemental opposition.[2]  (Doc. 125.)
7  June 23 was set as the deadline for a reply from the Fike
8  Defendants.  (*See* Doc. 123.)

9  ### III.   FACTUAL BACKGROUND

10     Joe and Connie Flores are apple growers based in Visalia,
11  California.  In September 1995, the Flores' entered into a
12  packing and marketing agreement with Fruit Marketing, Inc. (FMI),
13  now known as DDJ Inc.  During this relationship, FMI provided the
14  Flores' crop financing in exchange for a security interest in the
15  Flores' apple crops.  The terms of the loan are set forth in a
16  promissory note signed by Joe Flores.

17     In or around early 1998, the Flores began to suspect that
18  FMI was using improper accounting practices to calculate the
19  amount due to the Flores' under the packing and marketing
20  contract.  In April 1998, the Flores demanded access to all of
21  FMI's documents related to the handling and selling of the
22  Flores' 1997 and 1998 apple crops.  Throughout the remainder of
23  1998, the parties disputed the extent to which the Flores' were

24

25     [2]   At the May 15, 2006 hearing, Plaintiffs requested that
26  the arguments contained within their motion to alter/amend and
   their reply thereto be considered as opposition arguments to the
27  renewed motion to strike.  To the extent that these arguments
   address issued raised by Defendants' motion to strike and/or to
28  dismiss, they have been considered.

**5**

1   entitled access to these documents and whether the Flores needed

2   to pay $0.53 per page for copies of the documents.

3       At some point in mid-1998, the Flores entered into a packing

4   and marketing agreement with a different fruit packer, Hemphill &

5   Wilson enterprises ("H&W").  On October 16, 1998, the Fike

6   Defendants, on behalf of their client FMI, sent a letter to H&W,

7   informing H&W that FMI had a secured interest in the proceeds

8   from the Flores' 1998 apple crop.  On October 26, a

9   representative from H&W informed the Flores that H&W would not

10  perform the contract under such circumstances.  On October 27,

11  the Fike Defendants sent a letter to the Flores' formally

12  demanding payment of the amount due under the FMI note.

13  Throughout this entire period, the Flores' were still engaged in

14  a dispute with FMI, which was represented by the Fike Defendants,

15  over how much the Flores had to pay to obtain copies of FMI's

16  documents.

17      On April 27, 1999, an attorney filed a complaint on behalf

18  of the Flores, naming DDJ and related entities and individuals as

19  defendants.  *Flores, et al., v. DDJ Inc., et al.*, 1:99-cv-5878.

20  Disputes over access to documents from FMI's files continued

21  throughout 1999 and 2000.  Eventually, the Flores' received a

22  large number of documents from FMI.  However, the Flores' now

23  assert that these documents had been "sanitized," by one of the

24  DDJ Defendants, Dennis Hagobian, who was seen "shredding

25  documents from sales jackets for many days."  (*See* J. Flores

26  Decl. at ¶58.)  The evidence of document destruction was known to

27  the Flores' during the Flores I trial.

28

**6**

1    On July 31, 1999, DDJ sold most of its property to Norman

2  Trainer and his partner Steven Taft ("Trainer and Taft").   Among

3  the assets transferred to Trainer and Taft was the Flores'

4  promissory note. As part of the transaction, DDJ and Trainer and

5  Taft entered into an agreement whereby DDJ agreed to defend

6  against the Flores' lawsuit and pursue Trainer and Taft's

7  counterclaim against the Flores.

8    The Fike Defendants filed a cross-complaint against the

9  Flores on behalf of DDJ, alleging breach of contract and seeking

10  payment on the promissory note.   The Flores later challenged

11  DDJ's standing to bring the counterclaim on behalf of Trainer and

12  Taft.   Judge Ishii allowed the claim to go forward.

13    A jury trial commenced in July 2003.   On July 25, a jury

14  returned a special verdict, finding for plaintiffs on all causes

15  of action alleged against DDJ and finding for the Flores' on the

16  counterclaims.   The jury determined that the Flores' were

17  entitled to damages.

18    On October 15, 2004, the Flores' filed a second lawsuit,

19  alleging that individual officers of the Judgment Debtors

20  fraudulently transferred assets from the Judgment Debtors into

21  their own names. *See In Re Joe Flores, et al. v. Dennis*

22  *Hagobian*, et al., 1:04-cv-6405 ("*Flores II*").

23    On January 3, 2005, DDJ, Inc. and DDJ, LLC filed for Chapter

24  7 bankruptcy protection.

25  //

26  //

27  //

28  //

**7**

#### IV.   **ALLEGATIONS IN *FLORES III***

Plaintiffs' first amended complaint, which is **143 pages long,** presents the following eleven "causes of action."[3]

1.   Alter ego liability.

2.   Malicious prosecution.

3.   Malicious use of process, spoilation of evidence, and fraudulent concealment of evidence.

4.   Violation of the Uniform Fraudulent Transfer Act [Civil Code § 3439 et seq.].

5.   Violation of 7 U.S.C. §§ 499(b)(1), (2) & (4); PACA §§ 2(2) & (5); 21 U.S.C. §§ 331(a), (b), (c) & (k).

6.   Fraud, Deceit, Intentional and Negligent Fraud, and Constructive Fraud and Breach of Fiduciary Duty.

7.   Conversion.

8.   Civil Racketeering in violation of 18 U.S.C. § 1961.

9.   Negligent interference with or procurement of a breach of contract.

10.  Conspiracy to defraud and commit various other offenses against Plaintiff's business interests.

11.  Invasion of privacy.

Most of these claims in which the Fike Defendants have been named have been stricken or dismissed.  There is no need readdress those claims which have been previously found legally insufficient.

//

//

//

---

[3]    Many of these causes of action are subdivided into numerous separate "claims."

# V.   STANDARDS OF REVIEW

## A.   Motion to Strike.

The Fike Defendants move to strike the re-alleged malicious prosecution claim under California's "Anti-SLAPP" statute, California Code of Civil Procedure Section 425.16, which provides in relevant part:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.
>
> ***
>
> As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes:
>
> > (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;
> >
> > (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;
> >
> > (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest;
> >
> > (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Code Civ. Pro. § 425.16(b)(1) & (e).

A court considering a motion to strike under the anti-SLAPP statute must engage in a two-part inquiry.  First, a <u>defendant</u>

**9**

1  must make an initial *prima facie* showing that the plaintiff's

2  suit "aris[es] from" activity protected by the Anti-SLAPP

3  statute. *Brill Media Co. v. TCW Group, Inc.,* 132 Cal. App. 4th

4  324, 329 (2005); Cal. Code Civ. Pro. § 425.16(b)(1).   In

5  performing this analysis, the California Supreme Court has

6  stressed, "the critical point is whether the plaintiff's cause of

7  action itself was *based on* an act in furtherance of the

8  defendant's right of petition or free speech." *City of Cotati v.*

9  *Cashman*, 29 Cal. 4th 69, 78 (2002) (emphasis in original).

10      If the defendant is able to make this threshold showing, the

11  burden shifts to the plaintiff to demonstrate a probability of

12  prevailing on the challenged claims.   In practice, a plaintiff

13  must show that the claim is "both legally sufficient and

14  supported by a sufficient prima facie showing of facts to sustain

15  a favorable judgment if the evidence submitted by the plaintiff

16  is credited." *Jarrow Formulas, Inc. v. LaMarche,* 31 Cal. 4th

17  728, 744 (2003).   Claims for which Plaintiff is able to satisfy

18  this burden are "not subject to being stricken as a SLAPP." *Id*.

19

20      **B.   Motion to Dismiss**.

21      The Fike Defendants again move to dismiss the eighth cause

22  of action (civil RICO).   Federal Rule of Civil Procedure 12(b)(6)

23  provides that a motion to dismiss may be made if the plaintiff

24  fails "to state a claim upon which relief can be granted."

25  However, motions to dismiss under Rule 12(b)(6) are disfavored

26  and granted only where the claim is legally insufficient.   The

27  question before the court is not whether the plaintiff will

28  ultimately prevail; rather, it is whether the plaintiff could

**10**

prove any set of facts in support of his claim that would entitle him to relief.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  "A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Van Buskirk v. CNN, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (citations omitted).

In deciding whether to grant a motion to dismiss, the court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences" in the light most favorable to the nonmoving party.  *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); *see also Rodriguez v. Panayiotou*, 314 F.3d 979, 983 (9th Cir. 2002).  A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## VI.  DISCUSSION

### A.  Motion to Dismiss the Eighth Cause of action for Civil Racketeering in violation of 18 U.S.C. § 1961.

In an abundance of caution, the Fike Defendants again move separately to dismiss the civil RICO claims against them, as it is not clear from the face of the amended pleading whether Plaintiffs' amended this claim with respect to the Fike Defendants, after its dismissal.  Plaintiffs concede in their supplemental opposition that they did not amend the claim as to the Fike Defendants.  (Doc. 125.)  Accordingly, because there is no claim to dismiss, the motion is **DENIED AS MOOT.**

1

**B.   _Supplemental Jurisdiction_.**

2       Without a federal claim against the Fike Defendants, there

3   is reason to question whether it is appropriate to exercise

4   subject matter jurisdiction over any state law claims against the

5   Fike Defendants.  At the June 26, 2006 hearing on the instant

6   motions, the parties were afforded one additional opportunity to

7   submit further briefing on the issue of supplemental jurisdiction

8   under 28 U.S.C. § 1367.  The Fike Defendants filed a supplemental

9   memorandum on June 30, 2006 (Doc. 131); the Flores' filed their

10  own supplemental brief on July 5, 2006 (Doc. 132).  Both the Fike

11  Defendants and the Flores argue for the exercise of supplemental

12  jurisdiction.  Specifically, the Fike Defendants urge retention

13  of supplemental jurisdiction so that an order striking all the

14  state law claims may be entered.  The Flores' request

15  supplemental jurisdiction be exercised so that the state claims

16  may proceed in this court.[4]

17      Where there is at least one federal question in a case, a

18  federal court may exercise supplemental jurisdiction over state

19  law claims that are related to the federal claim so long as they

20  form part of the "same case or controversy."  28 U.S.C.

21  § 1367(a).  A district court may decline to exercise supplemental

22  jurisdiction if

23              (1)  the claim raises a novel or complex issue of State
                     law,
24
                (2)  the claim substantially predominates over the
25

26  _____

27      [4]    The Flores' also appear to request further oral
    argument on the Fike Defendants' motion to dismiss and/or strike
28  and their own motion to alter/amend.  The motion has been
    submitted for decision after supplemental briefing and no further
    oral argument is needed or justified.

1             claim or claims over which the district court has
              original jurisdiction,

2     (3)     the district court has dismissed all claims over
              which it has original jurisdiction, or

3

4     (4)     in exceptional circumstances, there are other
              compelling reasons for declining jurisdiction.

5     28 U.S.C. § 1367(c).

6         Here, the remaining (active) federal claim against the Fike

7     Defendants for Civil RICO has been dismissed, triggering the

8     potential for dismissal under § 1367(c)(3).  However, where

9     judicial economy, convenience, and fairness to the parties

10    strongly weigh in favor of retaining jurisdiction, it may be an

11    abuse of discretion to decline supplemental jurisdiction.  *See*

12    *e.g., Trustees of Construction Indus. Labors Health and Welfare*

13    *Trust v. Desert Valley Landscape and Maintenance, Inc.*, 333 F.3d

14    923, 926 (9th Cir. 2003).  Here, significant judicial and party

15    resources have been expended litigating the viability of the

16    state law claims brought against the Fike Defendants.  It is

17    appropriate to exercise supplemental jurisdiction over the state

18    law claims under such circumstances.[5]

19    //

20    //

21

22         [5]   In their supplemental filing, Plaintiffs note that the
      bankruptcy trustees have expressed their intention to abandon any

23    interest the estate may have in the claims brought in this case.
      Therefore, the Flores' suggest, there "now exist[] federal claims

24    in the trustee's abandoned portion of the instant action."  (Doc.
      125 at 2.)  The claim to which Flores' apparently refer is a

25    Perishable Agricultural Commodities Act claim, 7 U.S.C. § 499b,
      brought against the DDJ Defendants.  That claim was stayed on May

26    26, 2005, which stay has not yet been lifted.  Nevertheless, the
      claim has not been dismissed, an additional fact which suggests

27    exercise of supplemental jurisdiction over the remaining state
      law claims would be appropriate.

28

1          **C.   Timeliness of Plaintiffs' Amendment**.

2          The Fike Defendants argue that the entire amended complaint

3    should be dismissed for failure to comply with the court's order

4    that it be filed within 15 days of service of the February 21,

5    2006 memorandum decision.  The Fike Defendants maintain that

6    Plaintiffs' filing of the complaint on March 13, 2005 was

7    untimely.  Defendants are mistaken.  Although fifteen court days

8    from February 21, 2006 is March 8, 2006, Federal Rule of Civil

9    Procedure 6(e) provides for an additional three days "[w]henever

10   a party must or may act within a prescribed period after service

11   and service is made under Rule 5(b)(2)(B), (C), or (D)..."

12   Electronic service is one of the forms of service for which the

13   three additional days are added.  *See* Rule 5(b)(2)(D)("Delivering

14   a copy by any other means, including electronic means, consented

15   to in writing by the person served.")[6]  In this case, the

16   February 21, 2006 memorandum decision was served on Plaintiffs by

17   U.S. mail pursuant to Rule 5(b)(2)(B).   The additional three

18   days provided under Rule 6(e) moved the deadline to Saturday,

19   March 11, 2006.  Pursuant to Rule 6(a), the filing was not due

20   until the following business day, Monday, March 13, 2006, the day

21   on which it was timely filed.

22

23

24   ───────────────────

25        [6]    Although Rule 5(b)(2)(D) also provides that "[S]ervice
     by electronic means is complete on transmission," the three day
26   extension provided by Rule 6(e) nevertheless applies.  *See Wile
     v. Paul Revere Life Ins. Co.,* 410 F. Supp. 2d 1313, 1318 n.2
27   (N.D. Ga. 2005); *cf.* Local Rule 78-230(m)(applying the three day
     extension to both service by mail or electronic service in
28   prisoner cases).

### D.   <u>Motion to Strike</u>.

#### 1.   Timeliness of Fike Defendants' Motion to Strike.

Plaintiffs argue that the Fike Defendants' motion to strike was untimely filed.  The Flores' filed their first amended complaint on March 13, 2006.  Federal Rule of Civil Procedure 15(a) provides that a responsive pleading must be filed within ten (10) days of service of the amended complaint.  For the same reason that Defendants' were mistaken as to the timeliness of Plaintiffs' amended complaint, Plaintiffs' are mistaken as to the timeliness of Defendants' response.  Ten court days from March 13, 2006 is March 27, 2006.  However, that deadline is also extended three days pursuant to Federal Rule of Civil Procedure 6(e), shifting the deadline to March 30, 2006, the day on which the Fike Defendants' motions to strike and dismiss were timely filed.

#### 2.   It Is Improper to Grant Leave to Amend Claims Previously Stricken Pursuant to California's Anti-SLAPP Statute.

The Fike Defendants argue that it is not appropriate to permit amendment of claims that have been stricken pursuant to California's anti-SLAPP statute, the purpose of which is to eliminate "sham of facially meritless" allegations at the pleading stage.[7]  *See Simmons v. Allstate Ins.*, 92 Cal. App. 4th

---

[7]   Plaintiffs supplemental opposition mistakenly uses the catchword "standing" in describing the issue, suggesting that the Fike Defendants contend that Plaintiffs' "lack standing to amend their complaint."  (Doc. 125 at 4.)  Standing is not the issue here, as there is no dispute that Plaintiffs have <u>standing</u> as allegedly injured parties to bring the claims presented here. Rather, the critical question here is whether a court should have permitted amendment of claims stricken under the Anti-SLAPP statute.

1068, 1073 (2001).  If this case were in state court, there is little question that amendment would be **prohibited** after a successful anti-SLAPP motion:

> Allowing a SLAPP plaintiff leave to amend the complaint once the court finds the prima facie showing has been met would completely undermine the statute by providing the pleader a ready escape from section 425.16's quick dismissal remedy. Instead of having to show a probability of success on the merits, the SLAPP plaintiff would be able to go back to the drawing board with a second opportunity to disguise the vexatious nature of the suit through more artful pleading. This would trigger a second round of pleadings, a fresh motion to strike, and inevitably another request for leave to amend.
>
> By the time the moving party would be able to dig out of this procedural quagmire, the SLAPP plaintiff will have succeeded in his goal of delay and distraction and running up the costs of his opponent.  Such a plaintiff would accomplish indirectly what could not be accomplished directly, i.e., depleting the defendant's energy and draining his or her resources. This would totally frustrate the Legislature's objective of providing a quick and inexpensive method of unmasking and dismissing such suits....[G]ranting leave to amend the complaint after the court finds the defendant had established its prima facie case would be jamming a procedural square peg into a statutory round hole.

*Id*. at 1073-74 (internal citations omitted) (emphasis added).

Whether this prohibition applies in the federal system, with its liberal civil pleading requirements, is a more difficult question.  Pursuant to the *Erie* doctrine, state procedural laws are not to be applied in federal court if they directly conflict with a Federal Rule of Civil Procedure.  *Walker v. Armco Steel Corp., 446 U.S. 740, 749-50* (1980).  In the absence of a direct conflict, a court must "balance the state interest in its procedural rule with the twin purposes of the Erie Doctrine -- discouragement of forum-shopping and avoidance of inequitable administration of the laws.  *Metabolife Int'l, Inc. v. Wornick*,

264 F.3d 832, 845-46 (9th Cir. 2001)(citing *Hanna v. Plumer*, 380 U.S. 460, 468 (1965)).

The Ninth Circuit has examined several subsections of the anti-SLAPP statute in light of *Erie* and has reached different conclusions as to the applicability of those provisions in federal court.  In *United States v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th Cir. 1999), the Ninth Circuit considered § 425.16(b)(permitting a special motion to strike) and § 425.16(c)(permitting recovery of fees and costs).  The *Lockheed* court held that neither conflicted with the Federal Rules and that applying these provisions in federal courts advanced the purposes of the Erie doctrine.  In that case, the Ninth Circuit reasoned that § 425.16(b), permitting the filing of a special motion to strike, can exist "side by side" with Federal Rules of Civil Procedure 8, 12, and 56 "each controlling its own intended sphere of coverage without conflict."  171 F.3d at 1217 (citing *Walker v. Armco Steel*, 446 U.S. at 752).  The Ninth Circuit further reasoned that

> [A party] in federal court [] may bring a special motion to strike pursuant to § 425.16(b)...If unsuccessful, the litigant remains free to bring a Rule 12 motion to dismiss, or a Rule 56 motion for summary judgment. We fail to see how the prior application of the anti-SLAPP provisions will directly interfere with the operation of Rule 8, 12, or 56.

> [The party opposing the motion to strike] has not identified any federal interests that would be undermined by application of the anti-SLAPP provisions.... On the other hand, as noted earlier, California has articulated the important, substantive state interests furthered by the Anti-SLAPP statute.

> We also conclude that the twin purposes of the Erie rule-"discouragement of forum-shopping and avoidance of inequitable administration of the law"-favor application of California's Anti-SLAPP statute in

> federal cases. Although Rules 12 and 56 allow a
> litigant to test the opponent's claims before trial,
> California's "special motion to strike" adds an
> additional, unique weapon to the pretrial arsenal, a
> weapon whose sting is enhanced by a[n] entitlement to
> fees and costs. Plainly, if the anti-SLAPP provisions
> are held not to apply in federal court, a litigant
> interested in bringing meritless SLAPP claims would
> have a significant incentive to shop for a federal
> forum. Conversely, a litigant otherwise entitled to the
> protections of the Anti-SLAPP statute would find
> considerable disadvantage in a federal proceeding. This
> outcome appears to run squarely against the "twin aims"
> of the Erie doctrine.

*Id.* at 1217-18 (internal citations and quotations omitted).

However, in *Metabolife*, the Ninth Circuit held that § 425.16(f) (providing that an anti-SLAPP motion may be filed within sixty days of the filing of the complaint or, at the discretion of the court, at any later date) and § 425.16(g) (providing that the filing of an anti-SLAPP motion automatically stays further discovery absent a court order on a showing of good cause) conflicted with Federal Rule of Civil Procedure 56 because it "limits discovery and makes further discovery an exception rather than the rule." *Metabolife*, 264 F.3d at 646. The Ninth Circuit reasoned that Rule 56 "[o]n the contrary, [] ensures that adequate discovery will occur before summary judgment is considered." *Id. Metabolife,* in contrast to *Lockheed,* draws almost no distinction between an anti-SLAPP motion and a motion for summary judgment. In so holding, *Metabolife* arguably conflicts with *Lockheed's* holding that an anti-SLAPP motion is a procedural tool that can be distinguished from a motion for summary judgment. Yet, *Metabolife* cited with approval to and did not overrule *Lockheed's* holding as to § 425.16(b) and (c). *See* 264 F.3d at 845-46. The only way to interpret *Metabolife* without

**18**

eviscerating *Lockheed* is to apply it narrowly only to situations where a plaintiff asserts **prior to decision on an anti-SLAPP motion** that discovery might influence the outcome of the motion to strike.

The Ninth Circuit again took up the potential for conflict between the anti-SLAPP statute and the Federal Rules in *Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081 (9th Cir. 2004).  In that case, the district court deferred consideration of the defendant's anti-SLAPP motion to strike until after the filing of an amended complaint by plaintiff.  The anti-SLAPP motion was subsequently denied.  *See Id. at* 1090-91. The Ninth Circuit reasoned in *Verizon* that "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment." *Id*. at 1091.

> Moreover, the purpose of the anti-SLAPP statute, the early dismissal of meritless claims, would still be served if plaintiffs eliminated the offending claims from their original complaint. If the offending claims remain in the first amended complaint, the anti-SLAPP remedies remain available to defendants.

*Id*. (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109 (9th Cir.2003)).[8]

---

[8]     The Fike Defendants point to one district court case from the Central District of California that is squarely on point.  In *Thomas v. Los Angeles Times Communications, LLC*, 189 F. Supp. 2d 1005 (C. D. Cal. 2002), the district court granted the defendant's anti-SLAPP motion to strike, which had been filed less than sixty days after plaintiff filed his initial complaint. See Id. at 1009, 1017.  A footnote in the concluding paragraph of *Thomas* states:

1    Both *Metabolife* and *Verizon* suggest that a federal court

2  should hesitate to hear and decide an anti-SLAPP motion to strike

3  prior to affording a plaintiff an opportunity to amend or pursue

4  discovery.  Neither case discusses whether plaintiff should be

5  afforded such opportunities after the motion to strike has been

6  **granted.**  The reasoning in *Lockheed* is instructive.

> 7         [A party] in federal court [] may bring a special
>          motion to strike pursuant to § 425.16(b)...If
> 8       unsuccessful, the litigant remains free to bring a Rule
>          12 motion to dismiss, or a Rule 56 motion for summary
> 9       judgment. We fail to see how the prior application of
>          the anti-SLAPP provisions will directly interfere with
> 10      the operation of Rule 8, 12, or 56.

11  171 F.3d at 1217 (citing *Walker v. Armco Steel*, 446 U.S. at 752).

12  *Lockheed* is still good law.  To allow amendment after an anti-

13  SLAPP motion to strike has been granted eviscerates the purpose

14  of the anti-SLAPP statute.  Such an outcome would be inconsistent

15  with *Lockheed* and the strong policy underlying the anti-SLAPP

16  law.  The federal rules liberally permitting amendment are rules

17  of general, not specific, application.  The anti-SLAPP law

18  applies to state law claims which are governed by the substantive

19  law of California.

20    It was not appropriate to grant Plaintiff leave to amend any

21  of the state law claims.  Accordingly, the Fike Defendant's

22  motion to strike **all** of the state law claims from the amended

23  complaint is **GRANTED WITHOUT LEAVE TO AMEND.**

───────────────

> 25         The Court agrees with Defendants that Plaintiff may not
>          amend his Complaint after it is stricken pursuant to
> 26      California Code of Civil Procedure § 425.16. *See*
>          *Simmons v. Allstate Ins. Co.*, 92 Cal. App. 4th 1068,
> 27      1073-74 (2001).

28
Critically, *Thomas* did not consider any of the potentially
conflicting Ninth Circuit authority evaluating state-federal law
conflicts.  As a result, *Thomas* is not particularly persuasive
authority.

1

2

### 3. Defendants' Alternative Argument that Plaintiffs' Malicious Prosecution Claim Still Fails to Meet the Evidentiary Burden Under the Anti-SLAPP Statute.

3

4

As an alternative argument, the Fike Defendants renew their request for a ruling striking the malicious prosecution claim pursuant to the anti-SLAPP statute. (*See* Doc. 118-1.)

5

6

7

As set forth in the previous memorandum decision, the Anti-SLAPP statute does apply to malicious prosecution claims. (*See* Doc. 108 at 18-20.) Accordingly, Plaintiffs bear the burden to establish "a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff[s] is credited." *Jarrow*, 31 Cal. 4th at 738.[9]

8

9

10

11

12

13

Defendants correctly point out that this is an <u>evidentiary burden, not a pleading requirement</u>. The court must "consider the pleadings and the evidence submitted by the parties; it cannot weigh the evidence but instead must simply determine whether the plaintiff's evidence would, if credited, be sufficient to meet its burden of proof." *Ramona Unified Sch. Dist. v. Tsiknas,* 135 Cal. App. 4th 510, 591 (2005).

14

15

16

17

18

19

Plaintiffs' amended complaint somewhat expands their malicious prosecution allegation, but appears to advance many of

20

21

22

23

----

24

[9]     The elements of a prima facie case of malicious prosecution are (1) a judicial proceeding favorably terminated; (2) lack of probable cause; and (3) malice. *Villa v. Cole*, 4 Cal. App. 4th 1327, 1335 (1992). Malicious prosecution actions are disfavored under California law. *Sheldon Appel. Co. v. Albert & Oliker*, 47 Cal. 3d 863, 872 (1989) (tort of malicious prosecution "has historically been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution" action).

25

26

27

28

1    the same bases for the allegations.[10]  First, Plaintiffs assert

2    that the Fike Defendants knew or should have know of evidence

3    that <u>contradicted</u> the counterclaims filed against Plaintiffs.

4    The contradictory evidence cited by Plaintiffs includes: (1)

5    evidence that DDJ Inc maintained more than one set of accounting

6    records (FAC at ¶ 173),  and (2) evidence that DDJ officers

7    shredded DDJ documents <u>before</u> the underlying complaint was filed

8    (FAC at ¶174).  Plaintiffs suggest that the existence of such

9    evidence demands denial of the motion to strike.  Specifically,

10   Plaintiffs argue that where there is dispute as to the

11   Defendants' knowledge of facts on which the counterclaims are

12   based, such a dispute must be resolved by a jury. (Doc. 121 at

13   6.)  But, the mere existence of evidence tending to indicate that

14   DDJ's accounting and record-keeping was fraudulent does not

15   create a dispute as to whether DDJ's lawyers lacked sufficient

16   probable cause to file the counterclaim.  Such a rule would

17   automatically render a claim malicious if any contradictory

18   evidence exists.

19       Second, Plaintiffs re-assert an argument that was rejected

20   by the prior memorandum opinion –– that the Fike Defendants knew

21   or should have known that the counterclaim was false because DDJ

22   had assigned the alleged claim to a third party.  The prior

23   memorandum opinion reasoned that:

24

25

26       [10]    Again, the excessive length and unnecessary verbiage of

27   the original and amended complaints makes it exceedingly
     difficult for the court to discern how, if at all, the two

28   documents differ from one another.

**22**

1

2

3

4

5

6

7

8

> The Fike Defendants acknowledge that this transfer
> occurred, but maintain that DDJ Inc. had an agreement
> with Taft & Trainer that DDJ would defend the *Flores I*
> lawsuit and pursue any counterclaim for the Flores'
> outstanding debt under the note. (Fike Decl. ¶16) The
> existence of such an agreement was supported by written
> agreements. (*Id.* at Exhibit 2.) Although the jury in
> *Flores I* ultimately found that the Flores' did not owe
> money to either DDJ or Taft & Turner, there is
> absolutely no indication that the indemnity,
> assignment, and litigation enforcement agreement was
> invalid, and, even if invalid, that the Fike Defendants
> knew of any invalidity or that no reasonable attorney
> would have believed the agreement to be valid.

9  (Doc. 108 at 23.)  Plaintiffs now assert that the agreement with

10  Taft & Trainer "does not acknowledge the cross-complaint, or that

11  Traner & Taft assigned or otherwise agreed to permit assignment

12  of said liability for Fike Defendants to pursue [the cross-

13  complaint] on behalf of DDJ, Inc."  (FAC at ¶ 182.)  Plaintiffs,

14  however, do not explain the legal significance of this failure.

15  Plaintiffs cite, without clearly explaining, several other pieces

16  of evidence in support of their contention that the Fike

17  Defendants lacked probable cause to believe that DDJ retained the

18  right to assert claims against the Flores.  For example,

19  Plaintiffs argue that:

20

21

22

23

24

25

26

27

> Although Fike Defendants...do mention that "David A.
> Fike's clients provided him with both testimonial and
> documentary evidence that DDJ, Inc., has an agreement
> with Trainer & Taft, Inc., that DDJ Inc., would take
> responsibility for defending the underlying lawsuit and
> for pursuing the counterclaim for Flores' outstanding
> debt. (Fike Decl., ¶ 16). (See Memorandum of Points
> and Authorities in Support of Motion to Strike Certain
> Cuases of Action from Complaint at 11:22-25).  In
> addition, David A. Fike, in his Declaration clearly
> indicates that "DDJ Inc., had an agreement with Traner
> & Taft, Inc., that DDJ Inc., would take responsibility
> for defending the underlying lawsuit and for pursuing
> the counterclaim for Flores' outstanding debt. (See
> Declaration of David A. Fike, at ¶ 16).

28

**23**

1
2
3
4
5
6
7
8

> The sworn testimony of David A. Fike which references Dennis Vartan and Dennis Hagobian, is quite the opposite of what David A. Fike contends in his Declaration.  (See Declaration of Attorney, Marshall C. Whitney, in support of Motion to Strike at Exhibit 'A' at pg. 949-962 [testimony of Dennis Vartan at trial on underlying action] also see id at Exhibit 'B' at pgs. 1306-1428:2 [testimony of Dennis Hagobian]).  More specifically, Dennis Hagobian testified that Traner & Taft assigned [to] DDJ, Inc., the Flores' liability note back to DDJ, Inc. [sic]  Should testimonies of both, Dennis Vartan and Dennis Hagobian be credible, then surely DDJ Inc., and Fike Defendants were not prosecuting the counterclaim for breach of contract on behalf of Traner & Taft as the Court contends.

(Doc. 110 at 3.)   But, the testimony cited by the Flores is from the jury trial before Judge Ishii and has little or no bearing on whether the Fike Defendants had probable cause to file the counterclaims in the first place.  Moreover, a review of the testimony cited by the Flores' reveals that Dennis Hagobian consistently testified that DDJ retained the right to pursue a counterclaim against the Flores' to collect outstanding debt. (*See* Doc. 34, Whitney Decl., Ex. B at 1427.)  Again, the existence of somewhat contradictory testimony elsewhere in the trial record does not establish the absence of probable cause. It supports the inference that evidence exists to support both positions.

Plaintiffs now also allege that the Fike Defendants' refusal to put money in a trust fund supports a finding that probable cause was absent.  Again, however, Plaintiffs fail to explain the legal significance of this refusal, nor do they point to any caselaw suggesting that such a refusal demonstrates the absence of probable cause.

Finally, Plaintiffs re-assert the previously rejected argument that the Fike Defendants "knew or should have known that

1  Connie Flores was not participating in the marketing agreement or
2  any kind of financial agreement with DDJ, Inc., for the crop year
3  of 1997." As <u>evidence</u> in support of this assertion, Plaintiffs
4  rely exclusively on Judge Ishii's memorandum decision in *Flores I*
5  concerning Connie Flores' petition in for attorney's fees under
6  California Civil Code § 1717.

7       Section 1717 provides for the recovery of attorneys fees by
8  prevailing parties "in any action on a contract." (*See* 1:99-cv-
9  5878, Doc. 342.)  In opposition to Ms. Flores' fee petition, DDJ
10  Inc. argued that Ms. Flores was not entitled to fees because she
11  did not sign any of the relevant financial agreements.  (In other
12  words, DDJ argued that Ms. Flores was not entitled to fees for
13  prevailing on a contract action because she was not a party to
14  the contract.)  Plaintiffs suggest that DDJ's assertion of this
15  defense (and Judge Ishii's discussion of the defense in the
16  memorandum decision) supports a finding that the Fike Defendants,
17  who represented DDJ in *Flores I*, knew at the time the
18  counterclaim was field that Ms. Flores had not signed the
19  relevant documents and therefore lacked probable cause to file
20  the counterclaim against her.

21       Plaintiffs read too much into Judge Ishii's decision, which
22  examined the jurisprudence pertaining to attorney's fees awards
23  under section 1717 in some detail.  The decision reasoned that
24  Ms. Flores would only be entitled to an award under section 1717
25  if she would have been liable on the contract claim had the jury
26  returned a verdict in favor of <u>Defendants</u>.  But, contrary to
27  Plaintiffs' suggestion, Judge Ishii specifically noted in his
28  analysis that DDJ "<u>clearly believed</u> if [it] prevailed, [] Connie

**25**

Flores would have been liable for the advanced funds along with [] Joe Flores." (Doc. 342 at 6.) In part as a result of this finding, Judge Ishii concluded that Connie Flores was entitled to attorney's fees under section 1717. Judge Ishii's opinion does not on its own support a finding that the Fike Defendants lacked probable cause to name Connie Flores in the counterclaim. In fact, it supports the opposite conclusion by finding that DDJ "clearly believed" in the merit of its original counterclaim against Ms. Flores. The Flores' advance no additional evidence or arguments in support of such a finding.

### E. **Plaintiffs' Motion to Amend or Alter the February 21, 2006 Memorandum Decision**.

Plaintiffs also move to amend/alter a portion of the February 21, 2006 memorandum decision in three respects.

First, Plaintiffs assert that the decision to dismiss the malicious prosecution claim was based upon erroneous facts concerning the assignment agreement between DDJ and Trainer & Taft. This argument has been considered and rejected.

Second, Plaintiffs maintain that the court erred in finding that the litigation privilege applies to the abuse of process cause of action. Rather, Plaintiff suggests that the abuse of process claim is "married to [the] malicious prosecution allegation, and in such premises the complaint for abuse of process at the least should be granted leave to amend...." (Doc. 110 at 6.) This motion must be construed as a motion for reconsideration, which is governed by Federal Rule of Civil Procedure 60(b). Local Rule 78-230(k) specifies the showing a

party must make in a motion for reconsideration.  Critically, parties are required to indicate "what new or different facts or circumstances are claimed to exist which did not exist or were not shown upon such prior motion, or what other grounds exist for the motion..."  Local R. 78-230(k).

As discussed above, leave to amend was not properly granted with respect to the malicious prosecution claim and Defendants' motion to strike that claim has been granted.  But, even if granting leave to amend were proper under the circumstances, Plaintiff's attempt to associate his abuse of process claim with his malicious prosecution claim is misplaced as a matter of law. The February 21, 2006 memorandum decision ruled that the litigation privilege barred all of Plaintiff's state law claims except for the malicious prosecution cause of action because California law carves out a specific, but narrow exception for malicious prosecution actions to proceed despite the litigation privilege.

> The litigation privilege does not apply to claims of malicious prosecution.  Malicious prosecution actions are permitted because "the policy of encouraging free access to the courts is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied.  *Silberg*, 50 Cal.3d at 216.  This is perhaps the **only** exception to the absolute nature of the litigation privilege.  *Id.; see also Rubin,* 4 Cal. 4th 1193-94.

(Doc. 108 at 20 (emphasis added).)  There is no such blanket exception for abuse of process claims.  Rather, the February 21, 2006 memorandum decision examined the acts that formed the basis of the abuse of process claim and reasoned that they were protected by the litigation privilege:

> Defendants assert generally that all of the acts which
> underlie the abuse of process claim are subject to the
> litigation privilege.  As discussed above, the letter
> to H&M is a communication sent in anticipation of
> litigation to protect a claimed security interest,
> which naturally falls within the coverage of the
> litigation privilege.  The applicability of the
> privilege to the other alleged acts is not so clear-
> cut.  On the one hand, the attempt to charge the
> Flores' $0.53 per page for copies is communicative, and
> arguably conduct: the act of demanding payment for
> copies.  Similarly, the Fike Defendants alleged attempt
> to use documents at trial that were not produced at
> discovery and the Fike Defendants alleged involvement
> in the destruction of evidence is arguably conduct, not
> communication. However, such matters are inherently
> part of the discovery process and were redressible
> under discovery rules and should have been addressed
> during the underlying litigation.

(*Id*.)  Plaintiffs offers no legal authority to support their

contention that this reasoning is incorrect.

Finally, Plaintiffs challenge the prior memorandum

decision's conclusion that California Civil Code § 1714.10, which

requires pre-approval from a court prior to the filing of a

conspiracy complaint against an officer of the court, bars all of

Plaintiffs conspiracy claims against the Fike Defendants.

Although Plaintiffs concede that this conclusion is correct with

respect to the individual attorneys, Plaintiffs suggest that

section 1714.10 might not apply to the law firm of Emerich &

Fike.  Plaintiff, however, cites no authority to support this

distinction and none could be located.  Alternatively, Plaintiffs

request leave to "file the necessary pleadings with this Court to

suffice Civil Code § 1714.10, and obtain permission from this

honorable Court to file a complaint for conspiracy" against the

Fike Defendants.  (*See* Doc. 110 at 8-9.)  Again, as discussed, it

is not appropriate to grant leave to amend claims that have been

stricken pursuant to the Anti-SLAPP statute.  Moreover, the

evidentiary burden Plaintiffs faced in the Anti-SLAPP motion is

essentially identical to that which they would have been required

to overcome to obtain permission to file a conspiracy claim

against the Fike Defendants had they sought such permission.

Section 1714(a) provides:

> No cause of action against an attorney for a civil
> conspiracy with his or her client arising from any
> attempt to contest or compromise a claim or dispute,
> and which is based upon the attorney's representation
> of the client, shall be included in a complaint or
> other pleading unless the court enters an order
> allowing the pleading that includes the claim for civil
> conspiracy to be filed **after the court determines that
> the party seeking to file the pleading has established
> that there is a reasonable probability that the party
> will prevail in the action**.

(emphasis added.)  Plaintiff failed to satisfy that evidentiary

burden in opposition to the Anti-SLAPP motion and provides no

indication as to why the outcome would be any different upon

further briefing.

The motion for reconsideration is **DENIED**.

## VII.   CONCLUSION

For the reasons set forth above:

(1)  The Fike Defendants' motion to dismiss the Civil RICO claim

is **DENIED AS MOOT** because the claim has not been amended.

(2)  The Fike Defendants' motion to strike all of the state law

claims is **GRANTED** under the Anti-SLAPP law.

(3)  Plaintiffs' motion to amend or alter (construed as a motion

for reconsideration) is **DENIED.**

(4)  The Fike Defendants are **DISMISSED AS DEFENDANTS.**


**SO ORDERED 8/23/06**

                                    **/s/Oliver W. Wanger**
                                       **Oliver W. Wanger**
                                  **UNITED STATES DISTRICT JUDGE**